# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | | |
|---|---|---|
| EDIE WALLACE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  11-cv-1184 |
| | ) | |
| HEARTLAND COMMUNITY COLLEGE, | ) | |
| | ) | |
| Defendant. | ) | |

## O R D E R  &  O P I N I O N

This matter is before the Court on Defendant's Motion for Summary Judgment as to Counts I and II of Plaintiff's Complaint. (Doc. 4). For the reasons stated below, the Motion for Summary Judgment is granted.

### LEGAL STANDARD

Summary judgment should be granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In ruling on a motion for summary judgment, the Court must view the evidence on record in the light most favorable to the non-moving party. *SMS Demag Aktiengesellschaft v. Material Sciences Corp.*, 565 F.3d 365, 368 (7th Cir. 2009). All inferences drawn from the facts must be construed in favor of the non-movant; however, the Court is not required to draw every conceivable inference from the record. *Smith v. Hope School*, 560 F.3d 694, 699 (7th Cir. 2009). The Court draws only reasonable inferences. *Id.*

"Employment discrimination cases are extremely fact-intensive, and neither appellate courts nor district courts are 'obliged in our adversary system to scour the

record looking for factual disputes....'" *Greer v. Board of Educ. of City of Chicago, Ill.*, 267 F.3d 723, 727 (7th Cir. 2001) (quoting *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921-22 (7th Cir. 1993)). Once the movant has met its burden of showing the Court that there are no genuine issues of material fact, to survive summary judgment the "nonmovant must show through specific evidence that a triable issue of fact remains on issues on which he bears the burden of proof at trial." *Warsco v. Preferred Tech. Group*, 258 F.3d 557, 563 (7th Cir. 2001) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). If the evidence on record could not lead a reasonable jury to find for the non-movant, then no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. *McClendon v. Indiana Sugars, Inc.*, 108 F.3d 789, 796 (7th Cir. 1997). At the summary judgment stage, however, the court may not resolve issues of fact; disputed material facts must be left for resolution at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).

## RELEVANT FACTUAL BACKGROUND[1]

Edie Wallace (hereinafter "Plaintiff") was employed by Defendant as a tenured biology professor/instructor until her resignation in May of 2008. Plaintiff alleges in her Complaint that she suffered from fibromyalgia and osteoarthritis, which caused constant physical pain, frequent fatigue, and limited ability to walk and climb stairs. Plaintiff's pain was exacerbated by stressful situations. Plaintiff

---

[1] These facts are drawn from Plaintiff's Complaint, Defendant's Statement of Undisputed Material Facts, and Plaintiff's Additional Undisputed Material Facts. (Doc. 1; Doc. 21 at 2-6; Doc. 23 at 4-26, Doc. 29, and all exhibits attached to each Document). All genuine disputes and reasonable inferences are taken in Plaintiff's favor, as noted above.

and other natural-sciences faculty used laboratory assistants to help set up and arrange materials for laboratory courses. Plaintiff provided her assistants with detailed instructions for each laboratory course. Beginning in 2005, and continuing regularly thereafter, Plaintiff's assistants failed to follow her detailed instructions for laboratory setup. The assistants' failure to follow instructions resulted in necessary equipment and materials being missing from the laboratory for Plaintiff's courses. In order to rectify this problem, Plaintiff was forced to walk some distance and climb stairs to obtain assistance in setting up for her courses, and was subjected to significant stress, which resulted in significant physical pain. The assistants' poor performance was an issue for the entire faculty, not only Plaintiff.

On February 19, 2007, Plaintiff met with Dan Hagberg, her immediate supervisor, and Deborah Wentzel, a Grievance Officer, to discuss the entire faculty's complaints about lab assistant failures and how it affected her. Plaintiff left the meeting unsatisfied and with the impression that Mr. Hagberg disrespected her and harassed her by communicating past issues of disharmony between Plaintiff and various lab assistants and placing some of the blame on Plaintiff.

On March 21, 2007, the entire faculty submitted a formal grievance concerning the lab assistants' ineptitude to Steve Herald, the Defendant's Dean of Instruction.

On March 26, 2007, Plaintiff's physician sent Defendant a letter requesting accommodation of Plaintiff's medical problems by giving her flexibility in class scheduling and in work hours. The letter also explained the effect of stress on Plaintiff's symptoms.

Also in March 2007, Plaintiff met with Barbara Leathers, Defendant's Director of Human Resources to discuss the entire faculty's grievance concerning lab assistants and her February 19, 2007 meeting with Mr. Hapberg. During the meeting, Ms. Leathers provided Plaintiff with an official accommodation request form. On April 23, 2007, Plaintiff sent the formal request for an accommodation to the Defendant stating in the form that she sought 1) flexibility in class scheduling and work hours and 2) recognition of the effect of stress on her symptoms, the same accommodation requested by her medical doctor.

Also on April 23, 2007, Plaintiff sent two letters to Steve Herald and one to Ms. Leathers. In the first letter to Mr. Herald, Plaintiff reiterated the entire faculty's concerns over the laboratories. In the second letter to Mr. Herald, Plaintiff complained about Mr. Hagberg's treatment of her in the February 19, 2007 meeting and generally mentioned her stress symptoms. In the letter to Ms. Leathers, Plaintiff refers to the entire faculty's grievance, her interaction with Mr. Hagberg at the February 19, 2007 meeting, and stress over the lab problems. She did not include a request for any additional accommodation in any of these letters.

On May 18, 2007, Ms. Leathers, in written communications, unambiguously requested Plaintiff to clarify what specific accommodation she was seeking with reference to "recognition of the effect of stress on her symptoms" that she had written on her accommodation request form. Plaintiff responded that same day in an email communication acknowledging Mr. Hagberg had accommodated her with a flexible schedule but stating that his failure to implement changes <u>offered by the</u>

faculty meant she would still suffer stress and pain. The email contains no request specific to her for an accommodation concerning lab assistants.

On May 21, 2007, Plaintiff sent Ms. Leathers another letter in which she asserted that the emotional symptoms of her disabilities had not been addressed and that Mr. Hagberg created a hostile work environment by harassing her. Again, she failed to ask for an accommodation regarding her lab assistants. She concluded the letter by stating she would file a complaint with the Illinois Department of Human Rights ("IDHR") and possibly the federal Equal Employment Opportunity Commission ("EEOC").

On May 30, 2007, Ms. Leathers sent Plaintiff another letter in which she acknowledged that she understood Plaintiff was filing a claim of harassment against Mr. Hagberg. Ms. Leathers also stated in the letter that Defendant did not believe Plaintiff was legally disabled under the ADA given her ability to teach a full load and to walk without the assistance of any aids. The letter acknowledged the Defendant did provide Plaintiff with flexible scheduling and then offered more alternatives addressing Plaintiff's emotional symptoms such as referral to the Defendant's Employee Assistance Program for counseling, providing time off for such counseling, allowing breaks to utilize stress management techniques, and creating opportunities to explain fibromyalgia to the school's community. The letter concluded with an invitation to further discuss Plaintiff's issues.

On June 15, 2007, Plaintiff, in an email communication, rebuffed an appointment to meet with Defendant and discuss employment matters further. In

the email, Plaintiff explained that she thought further discussion would be futile given that the Defendant's opinion that she was not disabled under the ADA.

On August 28, 2007, Plaintiff filed a Charge of Discrimination with the Illinois Department of Human Rights ("IDHR") and the federal Equal Employment Opportunity Commission ("EEOC"). In that Charge, Plaintiff alleged that she is handicapped by fibromyalgia, which causes related symptoms of mental impairment, and osteoarthritis. She alleged that Defendant harassed her because of her handicaps between February 19, 2007 and May 30, 2007, and that this harassment was committed by Mr. Hagberg on February 19, 2007 by his "referring to past situations [relayed to him by third parties complaining of Plaintiff] in which he interpreted [Plaintiff's] behavior as being a problem, telling [her] that [her] treatment of the lab assistant was an issue, and telling [her] again that other anonymous lab assistants had refused to work with [her]." Further, she alleged that Mr. Hagberg used her "symptoms of mental impairment as a reason for ignoring my complaint." Plaintiff also alleged that between May 27 and May 30, 2007, Defendant failed to accommodate her disabilities by providing additional lab assistance and a flexible work schedule. Almost a year later on May 5, 2008, Plaintiff sent a letter of resignation, effective at the end of that semester. The IDHR dismissed Plaintiff's Charge in June 2009, and following a review at Plaintiff's request, affirmed the dismissal in October 2010.

Plaintiff filed her Complaint with this Court on May 16, 2011 alleging that Defendant denied her requests for an accommodation of her disabilities between mid-February and late May of 2007 (Count I) and that Defendant's failure to

address Plaintiff's problems at work led to her suffering intense physical pain, which created a hostile work environment (Count II).[2]

**DISCUSSION**

## I.  Count I- Failure To Accommodate

In Count I of the Complaint, Plaintiff alleges Defendant discriminated against her on the basis of her disabilities by failing to provide her with a reasonable accommodation upon her request. (Doc. 1 at 5-6). To prevail on a claim that one's employer violated the ADA by failing to reasonably accommodate a disability, a plaintiff must show that: (1) she is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability. *Brumfield v. City of Chicago*, 735 F.3d 619, 631 (7th Cir. 2013) (citing *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005)).[3] "As to the third element when the claim encompasses a failure to accommodate, the ADA requires that employer and employee engage in an interactive process to determine a reasonable accommodation. If a disabled employee shows that her disability was not reasonably accommodated, the employer will be liable only if it bears responsibility for the breakdown of the interactive process." *Sears*, 417 F.3d at 797 (internal quotation marks and citations omitted).

Defendant has decided not to contest either that Plaintiff was disabled within the meaning of the ADA (Doc. 21 at 8) or that Defendant was aware of the disability, thus the issues are deemed admitted for purposes of this motion for

---

[2] Additional Counts were previously dismissed in an Order and Opinion (Doc. 10) disposing of an earlier Motion for Summary Judgment brought by Defendant.

[3] The failure to reasonably accommodate a disabled employee constitutes discrimination under the ADA in and of itself. 42 U.S.C. § 12112(b)(5)(A).

summary judgment. However, Defendant contends Plaintiff can produce no evidence of material fact that demonstrates she was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation or that Defendant failed to make a reasonable accommodation to Plaintiff.

## A.     Plaintiff May Be A "Qualified Individual"

"The term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires" 42 U.S.C. § 12111(8). Whether a plaintiff is a "qualified individual" within the meaning of the ADA is a two-part inquiry. *Brumfield*, 735 F.3d at 632. First, the plaintiff must possess "the requisite skill, experience, education and other job-related requirements of the employment position" at issue. *Id.* citing 29 C.F.R. § 1630.2(m). Second, the plaintiff must be "capable of performing the job's 'essential functions' with or without reasonable accommodation from an employer," *Brumfield*, 735 F.3d at 632 (citing *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 862 (7th Cir.2005)), which the Seventh Circuit has recently explained essentially means that the plaintiff must show she requires an accommodation in order to be able to perform the essential functions of the job. *Id.* at 633 (citing 42 U.S.C. §§ 12111(8), 12112(b)(5)(A); *Hammel*, 407 F.3d at 862).

Defendant's argument that Plaintiff cannot produce evidence that she was otherwise qualified to perform all of the essential functions of her job, and specifically her duty as a faculty member to "serve the institution" by "promoting a

8

collegial work environment" has some merit. (*See* Doc. 21-2 at 8). Plaintiff admits the symptomatology of her disability includes the following:

> inability to remember common words and corresponding frustration, mood swings, [the] tendency to cry easily, unaccountable irritability, uncontrollable anger, sensory overload and overreaction, ringing in ears, with some hearing loss resulting in a loud speaking voice, reaction to severe pain: the body responds by inducing the "fight or flight" response. This may contribute to misunderstandings where the speech pattern is interpreted as anger when it really isn't. Any additional stress placed on me increases my symptoms.

(Doc. 23-7 at 15). Plaintiff tacitly acknowledges that some of these symptoms that are not obviously physical in nature are likely to be perceived and treated as behaviors that can be controlled and therefore would be inimical to the promotion of a collegial work environment. While there is evidence that this essential job function was raised by Defendant as a concern well prior to Plaintiff's initial complaints to her supervisor regarding the lab assistant performance problems and her request for relief under the ADA (Doc. 29 at 11-16), there does not seem to be any evidence that Defendant took action against Plaintiff for failure to perform that essential function. This rather apathetic concern about this particular essential job function over the entire course of Plaintiff's employment suggests that despite the characterization of "promoting a collegial work environment" as an essential job function, Defendant places little value on it. (Doc. 21-2 at 8). Thus there is a question as to whether this particular job function can be deemed "essential" within the meaning of the ADA and there is a sufficient showing by Plaintiff, for purposes of deciding this summary judgment motion, that she was otherwise qualified to perform her job.

## B. Plaintiff Cannot Prove That Her Requests For A Reasonable Accommodation Went Unheeded.

The third element a plaintiff must prove to succeed on a failure to accommodate claim is that the employer did not provide a reasonable accommodation. *Brumfield*, 735 F.3d at 631. Here is where the Plaintiff's evidence falls short.

After reviewing all the materials provided the Court, it is apparent that Plaintiff has been and continues to operate under a misunderstanding that apprising one's employer of one's disability and symptoms equates with informing the employer of the employee's desired accommodation. It does not. That is why an employer's knowledge of the disability is a distinct element of the failure-to-accommodate claim. *See Brumfield*, 735 F.3d at 631.

The following excerpts from Plaintiff's May 23, 2014 deposition highlight how Plaintiff conflated the impact of the lab assistants' performance on her with the impact on the faculty at large and also demonstrates how her supervisors could have been unable to differentiate her requests from the entire faculty's requests:

> *I want to take you to February of 2007 and ask if at that point in time you had a conversation with Dan Hagberg concerning the lab assistant problem.*
>
> Yes, that's correct, because what was happening is again, I would have to check on the dates with Aparna, but I felt that Aparna had been trained, okay, and she was making more and more mistakes that she should not have made and what was worse is when I pointed the mistakes out to her she would argue back with me and make excuses, and not only that, argue about why it should be done her way, okay.
>
> &#42;&#42;&#42;
>
> *Do you recall the date of that conversation?*
>
> Yes, February 19, 2007.

*Why did you want -- were you the initiator of the meeting or was Dan?*

I was the-- well, I was not the only initiator of the meeting.... Because we were running into the problems of having to do work that was not in our job description, and that included **not only myself, but the other faculty as well.**

***

*Okay. So when you met with Dan Hagberg was Deb Wentzel present?*

Yes.

*Were other faculty members present?*

**No, it was decided I should go** because I was senior biology -- senior anatomy and physiology faculty. The other anatomy and physiology faculty had only come the year before.

***

*[C]an you describe for us what occurred at that meeting?*

Yes. **We of course set up the meeting, told him the purpose of the meeting**, told why Deb would be there, and then I began and went through the list. I gave him a list of some of the specific problems that Aparna Sundar had caused. At that point I had not said anything about her talking back to me, I was more focused on the lab not being set up. This was not a personal issue with her as far as I was concerned.

And so we went through that. And at some point I said something to the effect about getting another lab assistant or -- and I gave an alternative, having Janet Beach-Davis check the cart to make sure everything was on it. And then he suddenly switched topic -- it seemed to me he switched topic because then he said he want[ed] to address that part of the problem was me, and I tried to stop him at that point because I felt this was the same issue that had arisen back in April, that -- and I said You know, stop, **this is not about me, you know, this is about the lab**, and then he went on.

Again I don't have my notes here but he was talking about Aparna complaining about how I had mistreated her. I tried to tell him what, from my point of view, had really happened at the time, and then he said at some point Well, the reason we can't get someone else is because no other lab assistant will work for you.

***

*Okay. Edie, I want to refer you to Exhibit 25.*

***

*Can you identify what that is?*

Yes, this is the proposed lab solutions from the instructors about labs.

11

*How was this prepared?*

We met, sat down, prepared the list, typed it up.

*Were these proposed solutions to address this lab assistant problem that you identified?*

Yes, and this would have been after the grievance was filed, you know, or had gone to the level of Steve Harold who was the dean at that point.

***

*Between the time this document was prepared in 2007 and the time you left the college at the end of the spring term 2008 did the college implement any of these proposals?*

Only a couple of them....

***

When I saw that the grievance process was getting nowhere at that point, after that meeting I felt that the only way I had to get some relief as I said before was to get lab assistants treated as an accommodation for my disability and be very specific about it.

*How did you go about doing that?*

I had already talked to Barb Leathers back in March about the whole issue.

***

*Tell me about that meeting.*

Yes, this was just prior to the faculty association filing a grievance. It was after we had had a meeting with the union representative from -- anyway, the union representative, IFT representative, and he had said that the disability was not part of the union contract and so I would have to deal with that separately. So I went to her and I discussed the issue with Dan Hagberg, the disability issue, the stress issue, all of that, and how I would go about addressing it. And that's when I got the form to fill -- the accommodation form. I asked her how do I fill this out and she didn't really have any suggestions for me. And that was the meeting in March.

*At the time of your meeting with Barb Leathers did you explain to her the history of the lab assistant problem?*

Oh, yes, quite definitely.

*Did you explain to her that you believed the stress from that problem was complicating your fibromyalgia?*

Yes, I did.

*At that point in time did you tell her what you were seeking as a way of resolving your concern?*

Yes, I did.

*What did you tell her?*

Well, I told her that I needed to have the lab assistants taken care of -- first I mentioned we were about to file a grievance, that is, the union, but I told her that I had been told it could not -- the union could not deal with the disability issue so that's why I was coming to her because I needed to deal with the lab assistant problem as a disability issue, so I made this very clear to her at that time.

*Did you make clear to her when you said you need to deal with the disability issues, what you wanted, what your objective was?*

Yes, that I needed competent lab assistants and have my lab set up properly.

(Doc. 23-4 at 41 - 50 (emphasis added)).

Thus, Plaintiff claims in her deposition testimony that she made Ms. Leathers aware that she sought lab assistance as an accommodation for her disability by discussing the matter with her. (Doc. 23-4 at 48). She admits Ms. Leathers provided her with the accommodation request form in that meeting. (*Id.* at 49). Plaintiff sent that formal accommodation request form to the Defendant on April 23, 2007, specifically stating she only sought "1. Flexibility in class scheduling and work hours" and "2. Recognition of the effect of stress on her symptoms." (Doc. 21-1 at 97). The form contains no other request. As far back as March 26, 2007, Plaintiff's physician had sent Defendant letter requesting the same accommodation.

(Doc. 23-7 at 33). Thus, in neither of those formal written communications did Plaintiff request an accommodation concerning lab assistants.

Later on, Plaintiff sent an email, on May 18, 2007, in which she acknowledged that Defendant had already afforded her flexibility in work scheduling but that was pursuant to a verbal agreement and she wanted "to put it in writing." (Doc. 21-1 at 103). Elsewhere, Plaintiff also acknowledged she was given accommodations for her "physical" symptoms (*id.* at 98) and that they were successful (*id.* at 53). The issue seems to be rather open and shut, but Plaintiff contends that she can produce evidence at trial that she also requested an accommodation concerning the lab assistants. Unfortunately for Plaintiff, the time to show her evidentiary hand is now in response to the summary judgment motion, which could terminate her ADA claim prior to trial. *See Warsco*, 258 F.3d at 563.

Courts have found that requests for accommodations need not be communicated through formal channels. *Lee v. District of Columbia*, 920 F. Supp. 2d 127, 136 (D.D.C. 2013) (no formal communication or written documentation to constitute an employee's request for a reasonable accommodation is required as long as it makes clear that the employee wants assistance for his or her disability. (internal quotation marks and citations omitted)). Furthermore, a collaborative back and forth between the employer and employee is part of the interactive process required by the regulations implementing the ADA and the case law. *Sears*, 417 F.3d at 805; 29 C.F.R. pt. 1630. The interactive process contemplates the parties will work together to identify an appropriate reasonable accommodation. *See Bultemeyer v. Fort Wayne Comty. Schools*, 100 F.3d 1281, 1285 (7th Cir. 1996). This

is why an employer who has failed to provide a reasonable accommodation will be liable <u>only</u> if it bears responsibility for the breakdown of the interactive process. *Sears*, 417 F.3d at 797. Thus, the case law indicates that Plaintiff's request for an accommodation was not necessarily bound to what she wrote on the Defendant's official form, but rather could also encompass other requests as long as they were clearly communicated to the Defendant.

Regretfully, Plaintiff cannot seem to even settle on what she actually requested as a reasonable accommodation beyond a flexible work schedule and recognition of her symptoms. Plaintiff complained in her original discrimination Charge that Defendant "failed to *fully* accommodate my request for lab assistance" from May 23, 2007 through May 30, 2007, and that Defendant "could have assigned someone else to be my lab assistant." (Doc. 23-8 at 25 (emphasis added)). This indicates she claims she requested reassignment of the lab assistants. In her Complaint, Plaintiff alludes that the accommodation she requested "was that the College intervene and assist in correcting the problem." (Doc. 1 at 5). She characterizes the "problem" as inept lab assistants were requiring her to walk and climb stairs in order to secure assistance, which subjected her to significant amounts of stress and pain. (*Id*. at 4). Now, in her Opposition Brief, Plaintiff explains that what she was actually requesting was for the Defendant merely "to take reasonable steps to oversee the lab assistants to make sure they were properly performing their duties." (Doc. 23 at 35). This ambiguity as to whether she was requesting mere supervision or reassignment alone belies the assertion that Plaintiff provided Defendant a clear understanding of what she wanted.

Nevertheless, the Court has scrutinized the parties' submissions to see whether there is evidence that Plaintiff told Defendant she was requesting "lab assistance" as a specific accommodation to her disabilities.

First, none of the evidence concerning Plaintiff's requests for the Defendant to "do something" about the lab assistants before February 2007 is relevant.[4] Plaintiff's charge of discrimination only relates to the time period of February 19, 2007 through May 2007. In her Charge, she specifically states Defendant failed to accommodate her requests for lab assistance and flexible scheduling in regard to a period from May 23, 2007 until May, 30, 2007 only. Therefore, Plaintiff's communications to Defendant concerning "lab problems" outside the timeframe of the charge is not relevant. Because the evidence is not relevant, it is not admissible. FED. R. EVID. 402. Courts may consider only admissible evidence in assessing a motion for summary judgment. *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009).

Second, in her Opposition Brief, Plaintiff cites to several exhibits—Exhibit 9, 9A, 10, 15, 16, and 25—in support of her contention that she notified Defendant that she wanted the lab assistant problem "dealt with", for lack of a better term, as an accommodation to her disability. These exhibits do not support Plaintiff's contention; they are nothing more than collected grievances and complaints that demonstrate the faculty at large[5]—not Plaintiff specifically—took issue with the lab

---

[4] It is worth noting that the Court has reviewed the evidence anyway and has not seen a specific request for the Defendant to take any action about the lab assistants as an accommodation to Plaintiff's disability.

[5] Plaintiff concedes the entire department suffered from the inept lab assistants, not just Plaintiff. (Doc. 23 at 36).

assistants' performance, and they cannot be construed as requests for accommodation of Plaintiff's disabilities. Some of the exhibits, such as Plaintiff's April 23, 2007 letter to Mr. Herald (Doc. 23-7 at 18), mention Plaintiff's stress symptoms, but none of these exhibits clarify she sought the amelioration of the lab assistant problem as the accommodation to her disability.

In a May 18, 2007 letter to Plaintiff (Doc. 21-1 at 102), Ms. Leathers unambiguously requested Plaintiff to clarify what specific accommodation she was seeking with reference to recognition of her symptoms on the request form. Similarly, a May 30, 2007 letter also demonstrates how Ms. Leathers attempted to engage in an interactive process with Plaintiff and clarify what Plaintiff needed to facilitate her difficulties. Plaintiff contends this evidence does not reflect that Ms. Leathers sought clarification from Plaintiff regarding her accommodation request. (Doc. 23 at 4 ("pages 138-148 of the Defendant's Exhibit A1 do not reflect that Barbara Leathers sought clarification from Wallace regarding her accommodation request")). Plaintiff's contention is baseless.[6]

The May 18, 2007 letter, at page 139 of Defendant's Exhibit A1, contains a clear and direct request for clarification from Plaintiff as to what specific accommodation she sought, yet Plaintiff now argues it does not. Similarly, page 146 of Defendant's Exhibit A1 contains another clear example of the Defendant reaching

---

[6] Not only is the contention baseless, it is disingenuous at best. Federal Rule of Civil Procedure 56(c)(1) provides in relevant part that "a party asserting that a fact... is genuinely disputed must support the assertion by... showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Simply asserting a fact is in dispute is not enough and stating the fact is disputed when the evidence cited clearly shows it is not truly disputed, is a very sharp practice that this Court looks upon with disfavor.

out to Plaintiff as part of the interactive process. This particular exhibit also demonstrates that the Defendant did not view the lab assistant issue as part and parcel of her request for an accommodation but rather as part of the general grievance filed by the entire faculty. (Doc. 21-1 at 108). The Court reproduces the passage below because the Court is baffled as to how Plaintiff can dispute that Ms. Leathers sought clarification from Plaintiff regarding her accommodation request.

> [Y]ou are apparently requesting that the College accommodate those situations in which you speak to your colleagues or supervisors with an angry or loud voice or a tone of voice that could be perceived as offensive. The College is prepared to assist you to reduce the anxiety and stress you may feel at times, as it would assist any employee. We can do so by providing time off for counseling, providing clear expectations of responsibilities and consequences, or allowing you breaks to use stress management techniques you may gain from counseling. The College will also be happy to refer you to the Employee Assistance Program for counseling should you desire. You also suggest that you would welcome an opportunity to explain fibromyalgia, and the College would consider some sort of informational program, either consisting of making informational packets available or perhaps having a qualified medical professional provide information.
>
> You have provided examples of situations in which you have accommodated students, one with dyslexia and another with depression. The "accommodations" you provided to them are of the same nature as the assistance that has already been provided to you and will continue to be provided to you. In a similar way, we are open to discussing the concepts I have set forth above.
>
> Finally, please understand the College's response certainly was not sent with the intention to offend you in any way. The College was most certainly not implying that you have a "character flaw" nor was it expressing a "discriminatory attitude." The College seeks only to understand what you request and to work with you to the benefit of all concerned.
>
> I welcome the opportunity to discuss the foregoing with you at your convenience.

(Doc. 21-1 at 109). The passage above can only be construed as an invitation for Plaintiff to explain to Ms. Leathers of how the Defendant could further accommodate Plaintiff's requests. Yet, Plaintiff has not provided any evidence of follow-up correspondence to Ms. Leathers articulating that her accommodation request encompassed Defendant taking action in regard to the lab assistants.

While Plaintiff has produced evidence that she made her superiors aware that she was experiencing stress and pain from having to deal with the inept lab assistants, there is still no evidence in the record that her communications contained specific requests for an accommodation concerning the lab assistants, except her deposition testimony, which is belied by the facts that she 1) failed to mention this purported request for lab assistance on the Defendant's accommodation request form, 2) does not provide any correspondence that she asserted this request when she was asked to clarify her request by Defendant, and 3) acknowledged of the importance of "putting in writing" her communications regarding her accommodation requests with the Defendant.

The fashioning of a reasonable accommodation is a cooperative process in which both the parties must make reasonable efforts and exercise good faith. *Beck v. Univ. of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996). Plaintiff's communications with Ms. Leathers demonstrate it was the Plaintiff who undercut the interactive process. In Plaintiff's correspondence to Ms. Leathers in response to the May 18th and 30th letters seeking further clarification of Plaintiff's requests, Plaintiff failed to mention she expected the Defendant to deal with the lab assistant issue as an accommodation to her disability. (Doc. 21-1 at 103, 104-105). If she truly

felt that action in regard to the lab assistants was the reasonable accommodation she sought, she probably would have stated as much in her letters. Instead, her responses were curt, defensive, threatening (as to legal action), and only made reference to the Defendant's faculty's general grievance against the lab assistants. (*Id*.). In another letter to Defendant written by Plaintiff's doctor dated as late as August 3, 2007, the doctor explains flexible scheduling and avoiding stressful situations would be helpful to Plaintiff, but again fails to specifically mention or request action regarding the lab assistants. (Doc. 21-1 at 112).

Regardless of the issue of whether Plaintiff ever sought lab assistance as a reasonable accommodation, Plaintiff cannot survive summary judgment because she can present no evidence that the Defendant did not take part in or terminated the interactive process of determining a reasonable accommodation.[7] Ms. Leathers' May correspondence seeking clarification of Plaintiff's request constituted sufficient efforts on the part of the Defendant to advance the interactive process.

---

[7] The Court notices that Seventh Circuit Pattern Civil Jury Instruction 4.08 (2008) seems to conflict with the rule articulated in *Sears*, which holds that when a disabled employee's claim is predicated on an employer's failure to reasonably accommodate a disability, such employer will be liable for a failure to accommodate "only if it bears responsibility for the breakdown of the interactive process." 417 F.3d at 797. Instruction 4.08 states in part that "[n]either party can win this case simply because the other did not cooperate in this process, but you may consider whether a party cooperated in this process when deciding whether a reasonable accommodation existed." That instruction survives from pre-2005 draft instructions. *See* October 2004 Draft Seventh Circuit Pattern Civil Jury Instructions available at http://www.ca7.uscourts.gov/Rules/pjury_civil_draft.pdf. *Sears* was decided in 2005. 417 F.3d 789. This Court has not found any subsequent Seventh Circuit or Supreme Court cases that overrule *Sears* or otherwise neuter its holding. Therefore the Court concludes to the extent that Instruction 4.08's proposition can be read to conflict with the rule articulated in *Sears*, such proposition has been effectively overruled.

On June 15, 2007, Plaintiff, in an email communication, rebuffed an appointment to meet with Defendant and discuss employment matters further. (Doc. 21-1 at 113). Despite Defendant's opinion that Plaintiff was not disabled under the ADA in regard to her physical ability to perform her job, it nonetheless was willing to discuss further accommodations with her. There can be no doubt then, given the correspondence between Plaintiff and Ms. Leathers, that Plaintiff was responsible for the breakdown of the interactive process that failed to result in the identification of the resolution of the lab assistant problem as the reasonable accommodation that would free Plaintiff to perform her job without the burden of her disability, not Defendant. As was explained in *Sears*, if a disabled employee shows that her disability was not reasonably accommodated, the employer will be liable *only* if it bears responsibility for the breakdown of the interactive process. 417 F.3d at 797 (emphasis added); *Rehling v. City of Chicago*, 207 F.3d 1009, 1016 (7th Cir. 2000) (failure to accommodate plaintiff "must show that the result of the inadequate interactive process was the failure of the [defendant] to fulfill its role in 'determining what specific actions must be taken by an employer' in order to provide the qualified individual a reasonable accommodation."); *see Beck*, 75 F.3d at 1136 (The Seventh Circuit concluded an employer was not liable under the ADA for the breakdown in the interactive process which is supposed to lead to an accommodation of the disabled employee because there was no evidence that the employer obstructed the process but rather made reasonable efforts to communicate with employee and provide an accommodation based on information the employer possessed).

In short, Plaintiff has not produced evidence that she characterized the supervision/termination/restructuring of the lab assistants as an accommodation for her disabilities. Defendant has produced unrefuted evidence Plaintiff acknowledged Defendant did provide her with flexible scheduling she specifically requested and other accommodations in regard to her "physical" symptoms. (Doc. 21-1 at 53, 98 and 103). Moreover, Plaintiff has not presented any evidence that would lead a trier of fact to any other conclusion other than she was responsible for undermining and breaking off the interactive process to reach a reasonable accommodation beyond what she was already provided. Count I is therefore dismissed.

## II.      Count II- Hostile Work Environment

As an initial matter, the Court recognizes that although the Seventh Circuit has refrained from explicitly deciding whether hostile work environment claims are cognizable under the ADA, it nevertheless has assumed they are. *E.g., Mannie v. Potter*, 394 F.3d 977, 982 (7th Cir. 2005).[8] This Court will follow precedent and also assume Plaintiff's hostile work environment claim is cognizable.

Defendant argues that summary judgment should be granted in its favor on Plaintiff's Count II because it is based on a claim of hostile work environment predicated on different circumstances than the claim included in her August 17, 2007 charge of discrimination with the IDHR and EEOC. Plaintiff counters that the two hostile work environment claims are so closely related that she can proceed with it.

---

[8] Other circuits have unequivocally stated such claims are cognizable. *Fox v. General Motors Corp.*, 247 F.3d 169 (4th Cir. 2001), *Flowers v. S. Reg'l Physician Serv., Inc.*, 247 F.3d 229, 235 (5th Cir. 2001).

It is undeniable that in the Complaint Plaintiff contends that "because of the intense physical pain described [in paragraphs one through twenty of the Complaint] and the failure of the College to take any action to address the work problem she was experiencing Wallace's work environment with the College became both unwelcome and hostile." (Doc. 1 at 6). Plaintiff's "work problem" is alleged in the Complaint to be that beginning in 2005 and continuing regularly thereafter the individuals assigned to assist Plaintiff with her laboratory courses failed to follow her detailed instructions. (Doc. 1 at 4). As a result, laboratory sessions convened without necessary equipment and materials which caused Plaintiff significant stress and required her to walk and climb stairs in order to secure assistance for the laboratory sessions. (*Id*.). This in turn caused her physical pain due to her medical condition. (*Id*.).

However, in her original Charge of discrimination to the IDHR, Plaintiff's work problem in regard to her hostile work environment claim was that her supervisor, Dan Hagberg, "responded [to her requests] by creating a hostile environment. His harassing behaviors included, but was not limited to, referring to past situations in which he interpreted my behavior as being a problem, telling me that my treatment of the lab assistant was an issue, and telling me again that other anonymous lab assistants, had refused to work with me. Mr. Hagberg attempted to use my symptoms of mental impairment as a reason for ignoring my complaint." (Doc. 21-4 at 3-9).

In general, a federal employment discrimination plaintiff is limited to pursuing the claims she made before the EEOC. *Teal v. Potter*, 559 F.3d 687, 691

(7th Cir. 2009) (citing *Cheek v. Western & Southern Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994); *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1110 (7th Cir. 1992)). This requirement's purposes are "to promote resolution of the dispute by settlement or conciliation and to ensure that the sued employers receive adequate notice of the charges against them." *Teal*, 559 F.3d at 691. Nevertheless, Plaintiffs are also able to pursue claims that are "like or reasonably related to the allegations of the [administrative] charge and growing out of such allegations.'" *Id.* at 691-92. (quoting *Jenkins v. Blue Cross Mut. Hosp. Ins., Inc.*, 538 F.2d 164, 167 (7th Cir. 1976) (alteration in original)). This inquiry turns on whether "there is a reasonable relationship between the allegations in the charge and those in the complaint, and the claim in the complaint could reasonably be expected to be discovered in the course of the EEOC's investigation." *Id.* at 692 (citing *Cheek*, 31 F.3d at 500). Put another way, "[a]llegations outside the body of the charge may be considered when it is clear that the charging party intended the agency to investigate the allegations." *Cheek*, 31 F.3d at 502 (citing *Rush*, 966 F.2d at 1110-11; *Box v. A & P Tea Co.*, 772 F.2d 1372, 1375 (7th Cir. 1985)). At a minimum, the original discrimination charge and the subsequent complaint must describe the same conduct and implicate the same individuals. *Cheek*, 31 F.3d at 501 (emphasis added).

The Court has reviewed Plaintiff's Charge before the agencies and the evidence cited by the parties. First and most significantly, the two claims are not reasonably related in regard to the offending conduct. In the Charge, Plaintiff clearly alleged that the reaction of her superiors, Mr. Hagberg and Ms. Leathers, to

her complaints levied in a meeting created a hostile work environment through a series of harassing actions, such as blaming her for the inability to work well with lab assistants. In the Complaint however, she is alleging that pain she suffered from having to deal with inept laboratory assistants caused the allegedly hostile work environment. Under *Cheek*, this does not constitute the same conduct. *Id*. The conduct described in the charge relates to discrete acts of harassment made by Plaintiff's supervisors after a meeting. The conduct described in the Complaint relates to the general failure to acquiesce to Plaintiff's purported work modification requests. They are not reasonable related as they do not speak to the same conduct.

Second, the charge explicitly limits the allegations of hostile work environment to actions during the period of February 19, 2007 through May of 2007. (Doc. 5, Ex. A-1). The Complaint alleges the hostile work environment relates to events beginning in 2005 and continuing thereafter. This huge difference in timeframe undermines any reasonable expectation that the agency would discover allegations of a hostile environment regarding Plaintiff's pain due to stress brought on by her interactions with the lab assistants. The Charge's limited timeframe reasonably implies to the agency that Plaintiff believed the hostile work environment began in February and ended in May 2007 and did not relate to any other time period, so the agency would not be motivated to look back beyond February 19, 2007, the date of the meeting that initiated the purportedly hostile environment.

Plaintiff states that a June 25, 2007 letter (Doc. 23-8 at 12-14) Plaintiff wrote to Thomas Garber, an IDHR investigator, satisfies the second prong of the analysis,

which is that "[a]llegations outside the body of the charge may be considered when it is clear that the charging party intended the agency to investigate the allegations." *Cheek*, 31 F.3d at 502 (citing *Rush*, 966 F.2d at 1110-11; *Box*, 772 F.2d at 1375). According to Plaintiff, this letter sufficiently apprised the IDHR officials of the nature and scope of Plaintiff's claims such that they would be aware of Plaintiff's claim in the Complaint that she was subjected to a hostile work environment from 2005 until she retired due to being forced to endure physical pain because of Defendant's failure to provide adequate lab assistants. (Doc. 23 at 41).

The Court rejects this argument. The letter explicitly informs Mr. Gardner that Mr. Hapberg's response to Plaintiff's allegations during the February 19, 2007 meeting was the creation of a hostile work environment. (Doc. 23-8 at 12). Moreover, Plaintiff does not mention pain stemming from interactions or dissatisfaction with inept lab assistants contributing to a hostile work environment at all in the letter. (*Id.*).

Because Plaintiff points to no evidence that supports the contention that the agency should reasonably have discovered her hostile work environment claim encompassed pain she suffered from having to deal with the lab assistants, Plaintiff cannot pursue the allegation in this Court, and Defendant's instant Motion for Summary Judgment must be granted as to Count II.[9]

Assuming arguendo that the claim described in the Complaint does encompass the alleged harassment described in the original charge to the IDHR,

---

[9] It is with regret that the Court grants the motion as to Count II as there does not seem to be any reason why the Defendant could not have moved for summary judgment on this issue near the outset of the case, as it did with Counts III and IV.

Plaintiff's claim must still fail because she cannot establish a necessary element of the claim, which is that she was subjected to an objectively hostile environment.[10] In order to prevail on a hostile environment harassment claim, a plaintiff must show that his or her work environment was both subjectively and objectively hostile. *Silk v. City of Chicago*, 194 F.3d 788, 804 (7th Cir. 1999) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (a Title VII sexual harassment case)). An objectively hostile environment is one that a reasonable person would find hostile or abusive. *Silk*, 194 F.3d at 804 (citing *Harris*, 510 U.S. at 21). In determining whether a plaintiff has met this standard, courts must consider all the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating; or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Silk*, 194 F.3d at 804 (citing *Harris*, 510 U.S. at 23). Ultimately, the harassment must be so severe and pervasive as to alter the conditions of plaintiff's employment and create an abusive working environment. *Silk*, 194 F.3d at 804.

First, assuming that Plaintiff's hostile work environment claim encompasses the allegations that Plaintiff experienced intense physical pain because of the lab assistant problem and the College's failure to resolve that problem, there is no rational person who would think this was discriminatory since every faculty member was subject to the lab assistant problem. It is undeniable that all the

_____

[10] While the Court is highly doubtful Plaintiff could establish to a jury that she suffered a subjectively hostile environment given her allegations that she "suffered" the ineptitude of these lab allegations since 2005 and did not resign until 2008, there is no question there is enough evidence of her subjective reactions to warrant denial of summary judgment on this particular issue.

instructors, not just Plaintiff, were impacted by the inept lab assistants. That the impact was felt by an entire group of people, none of whom are alleged to have suffered from any disabilities, undercuts any argument that Plaintiff alone was discriminated against or singled out to suffer a hostile environment on the basis of her disability.

Second, the conduct of which Plaintiff complains does not even begin to approach the level of severity found necessary to establish a hostile environment. *See Silk*, 194 F.3d at 804. There are no allegations in the Complaint or citations of fact in the summary judgment materials that describe conduct similar to that identified in *Harris* as indicia of hostility, such as name-calling or offensive utterances, physical threats or acts of humiliation. 510 U.S. 17. Plaintiff's hypersensitive reactions to objectively innocuous conduct such as Ms. Leather's contention that Plaintiff was not disabled within the meaning of the ADA and Mr. Hagberg's mention of past incidents in a meeting do not approach the type of severe harassment likely to offend an objective person. (Doc 21-4 at 4).

Third, Plaintiff was not subjected to any alteration in a term of employment. *Silk*, 194 F.3d at 804. The closest Plaintiff comes to establishing this factor is her allegation that her immediate supervisor, Mr. Hagberg, mentioned relieving her of the obligation of teaching labs. However, his supervisor, Ms. Leathers, ensured Plaintiff in writing that no such action was being contemplated and that Mr. Hagberg was merely considering ways to provide an accommodation to Plaintiff, not to penalize her. (Doc. 21-1 at 101). In fact, Mr. Hagberg had already shuffled schedules in the past and reassigned Plaintiff from an 8 a.m. lab to a different time,

an accommodation that Plaintiff acknowledged was effective in accommodating her disability. (Doc. 21-1 at 53).

In short, Plaintiff can point to nothing that would support the claim that she was subjected to an objectively hostile work environment in regard to her disabilities. This Count fails as a matter of law.

## CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment (Doc. 21) is GRANTED. Summary judgment is granted in Defendant's favor on Counts I and II of Plaintiff's Complaint. IT IS SO ORDERED.

CASE TERMINATED.

Entered this 18th day of June, 2014.


s/ Joe B. McDade
_____
JOE BILLY McDADE
United States Senior District Judge
